**NOT DESIGNATED FOR PUBLICATION**

**STATE OF LOUISIANA**

**COURT OF APPEAL**

**FIRST CIRCUIT**

**2022 KA 1025**

STATE OF LOUISIANA

VERSUS

DERRICK J. COUSIN

Judgment Rendered: JUN 1 5 2023 _____

\* \* \* \* \* \*

On Appeal from the Twenty-Second Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Docket No. 609899
Honorable William H. Burris, Judge Presiding

\* \* \* \* \* \*

| | |
|---|---|
| Bertha M. Hillman<br>Covington, Louisiana | Counsel for Defendant/Appellant<br>Derrick J. Cousin |
| Derrick J. Cousin<br>Angie, Louisiana | Defendant/Appellant<br>Pro se |
| Warren L. Montgomery<br>District Attorney<br>J. Bryant Clark, Jr.<br>Assistant District Attorney | Counsel for Plaintiff/Appellee<br>State of Louisiana |

\* \* \* \* \* \*

**BEFORE:  McCLENDON, HOLDRIDGE, AND GREENE, JJ.**

**McCLENDON, J.**

Defendant, Derrick J. Cousin, was charged by bill of information with aggravated burglary, a violation of LSA-R.S. 14:60, and attempted first degree rape,[1] a violation of LSA-R.S. 14:42 and LSA-R.S. 14:27 (counts one and two, respectively). The defendant filed a motion to suppress statements, which the trial court denied. . After a trial by jury, defendant was found guilty as charged on each count. The trial court denied defendant's "motion for post-verdict judgment of acquittal or new trial." The trial court then sentenced defendant to thirty years of imprisonment at hard labor on count one and to forty-five years of imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count two, to be served concurrently. Defendant now appeals, assigning error in a counseled brief to the trial court's rulings on a challenge for cause and his motion to suppress statements. Defendant filed a pro se brief assigning error to the sufficiency of the evidence on both counts and asserting double jeopardy. For the following reasons, we affirm the convictions and sentences.

## STATEMENT OF FACTS

On September 28, 2018, police officers with the St. Tammany Parish Sheriff's Office (STPSO) were dispatched to North Eighth Street in Slidell, the scene of a residential burglary in progress reported by G.W. (the victim).[2] That morning, at approximately 1:30 a.m., G.W. was at home alone when her home alarm sounded, signaling that her phone[3] had a technical issue. She got up to turn her alarm off. When she returned to her bedroom, she looked at the monitor[4] for her front porch camera and saw a male individual looking into her house through her front door. Apparently using her cell phone, G.W. immediately called 911, reported a prowler, and asked for police assistance. While G.W.

---

[1] Effective August 1, 2015, the crime of "aggravated rape" was renamed "first degree rape." 2015 La. Acts No. 256, §1. Any reference to the crime of aggravated rape is the same as a reference to the crime of first degree rape. LSA-R.S. 14:42(E).

[2] Herein, we will refer to the victim by her initials only. See LSA-R.S. 46:1844(W).

[3] While G.W. does not specify as such, based on her testimony, apparently her home phone landline stopped working. Her home alarm system had distinct sirens for a break-in and phone interruption. The siren that woke her up was related to her phone line. Prior to noticing a prowler, she used her cell phone to try to check on her home line, but her phone company was closed.

[4] The monitor was located on G.W.'s bedroom dresser.

2

was on the phone with 911, the individual entered her home and began kicking her bedroom door. G.W. held the phone with her right hand while holding her bedroom door shut with her left shoulder. In order to scare the individual off, G.W. acted as though the police had already arrived and began yelling for them to enter her home. G.W. remained on the line with 911, as she repeatedly yelled "Police, police. Come in[,]" and "Thank you, police . . . Thank you, Jesus." The ruse was successful, and the intruder left G.W.'s home before police officers arrived. The intruder was in G.W.'s house for an estimated two to four minutes.

Captain Gordon Summerlin, Deputy Austin Satter, and Detective Dave Miceli with the STPSO were in route to G.W.'s residence while she was still on the line with the dispatcher. They arrived at her home within minutes of the inception of the 911 call. Upon their arrival, the officers discovered two cut wires, a telephone wire and a coaxial cable, on the side of the residence. After the officers entered the home and made contact with G.W., they observed damage to her bedroom door.[5] The officers viewed footage from G.W.'s security camera showing the perpetrator, who was armed with a knife and wearing gloves, as he approached G.W.'s front door multiple times and went toward the side of the house where the cut telephone lines were located. They also watched footage showing him leaving G.W.'s home and walking across the street.

The officers went to the residence that the surveillance footage showed the perpetrator walking toward, knocked on the door, and asked the occupants to exit the house. The occupants complied. When defendant stepped out of the house, the officers recognized him from the surveillance footage.

The officers conducted a National Crime Information Center inquiry and determined that defendant had a prior arrest for rape. A search warrant for defendant's residence was obtained and executed that morning. During the search, the officers recovered a knife that "closely matched" the knife seen in the perpetrator's possession on the surveillance footage. The defendant was placed under arrest and transported to

---

[5] Consistent with testimony presented at trial, photographs of the scene taken after the incident, including the interior and exterior of the victim's home, were admitted into evidence during trial.

3

the STPSO.  After being advised of his **Miranda**[6] rights, defendant participated in a recorded interview.  Defendant did not testify at trial.

## PRO SE ASSIGNMENT OF ERROR NUMBER ONE

In pro se assignment of error number one, defendant argues that the evidence is insufficient to support his convictions of aggravated burglary and attempted first degree rape.  He argues that no reasonable juror could conclude that he entered the victim's home with the intent to commit a theft.  Defendant further maintains that he lacked specific intent to commit first degree rape or any responsive offense thereof, that the police assumed rape was his intent because of his prior conviction, and that he never came in direct contact with the victim.[7]

A conviction based on insufficient evidence cannot stand, as it violates due process.  See U.S. Const. amend. XIV, LSA-Const. art. I, § 2.  The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the State proved the essential elements of the crime, and defendant's identity as the perpetrator of that crime, beyond a reasonable doubt.  See LSA-C.Cr.P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Oliphant**, 2013-2973 (La. 2/21/14), 133 So.3d 1255, 1258 (per curiam); **State v. Mellion**, 2021-1116 (La.App. 1 Cir. 4/8/22), 342 So.3d 41, 45, writ denied, 2022-00732 (La. 6/22/22), 339 So.3d 1186, cert. denied, ___ U.S. ___, 143 S.Ct. 319, 214 L.Ed.2d 141 (2022).  When circumstantial evidence forms the basis of the conviction, the evidence, "assuming every fact to be proved that the evidence tends to prove ... must exclude every reasonable hypothesis of innocence." LSA-R.S. 15:438; **Oliphant**, 133 So.3d at 1258.  Further, when the jury reasonably rejects the hypothesis of innocence

---

[6] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[7] When issues are raised on appeal contesting the sufficiency of the evidence and alleging one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. **State v. Hearold**, 603 So.2d 731, 734 (La. 1992); **State v. Duhon**, 2018-0593 (La.App. 1 Cir. 12/28/18), 270 So.3d 597, 609, writ denied, 2019-0124 (La. 5/28/19), 273 So.3d 315.  The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under **Hudson v. Louisiana**, 450 U.S. 40, 43, 101 S.Ct. 970, 972, 67 L.Ed.2d 30 (1981).  However, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial. **Hearold**, 603 So.2d at 734; **Duhon**, 270 So.3d at 609.

4

presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. Dyson**, 2016-1571 (La.App. 1 Cir. 6/2/17), 222 So.3d 220, 228, writ denied, 2017-1399 (La. 6/15/18), 257 So.3d 685.

The due process standard does not require the reviewing court to determine whether it believes the witnesses or whether it believes the evidence establishes guilt beyond a reasonable doubt. **State v. Livous**, 2018-0016 (La.App. 1 Cir. 9/24/18), 259 So.3d 1036, 1040, writ denied, 2018-1788 (La. 4/15/19), 267 So.3d 1130. Rather, appellate review is limited to determining whether the facts established by the direct evidence, and inferred from the circumstances established by that evidence, are sufficient for any rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. The weight given evidence is not subject to appellate review; therefore, an appellate court will not reweigh evidence to overturn a factfinder's determination of guilt. **Id.**

Aggravated burglary, in pertinent part, is the unauthorized entering of any inhabited dwelling where a person is present, with the intent to commit a felony or any theft therein if the offender is armed with a dangerous weapon. LSA-R.S. 14:60(A)(1). Aggravated burglary is a specific intent crime.[8] Thus, the actor must specifically intend to accomplish certain prescribed criminal consequences. **State v. Delmore**, 2016-1614 (La.App. 1 Cir. 6/2/17), 2017 WL 2399363, *3 (unpublished), writ denied, 2017-1304 (La. 3/2/18), 269 So.3d 706.

Attempted first degree rape, in pertinent part, is the specific intent to commit anal, oral, or vaginal sexual intercourse with a person without that person's lawful consent, where the offender does an act for the purposes of and tending directly to accomplish one or more of those acts of intercourse, and the victim is prevented from resisting the act because the offender is armed with a dangerous weapon. See LSA-R.S. 14:27; LSA-R.S. 14:41; LSA-R.S. 14:42(A)(3). Thus, attempted first degree rape is

---

[8] Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1).

a specific intent crime. LSA-R.S. 14:27; **State v. Barras**, 2019-897 (La.App. 3 Cir. 2/3/21), 2021 WL 360908, *2 (unpublished), writ denied, 2021-00442 (La. 6/22/21), 318 So.3d 46.

Louisiana's attempt statute rejects factual impossibility as a defense, stating "it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose." LSA-R.S. 14:27(A). However, mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended. LSA-R.S. 14:27(B). The comments under the attempt statute point out that the essential elements of an attempt are "an actual specific intent to commit the offense, and an overt act directed toward that end." Thus, "one who arms himself with a dangerous weapon and lies in wait or seeks for the intended victim, but is apprehended before the victim appears, should be guilty of an attempt." See LSA-R.S. 14:27; Reporter's Comments; see also **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The distinction between which of a defendant's actions constitute an attempt, and which are mere preparation, is fact specific to each case; where a defendant's actions fall on the continuum is a fact question for the jury or trier of fact. See **Ordodi**, 946 So.2d at 662.

Specific intent can be formed in an instant. Specific intent need not be proven as a fact but may be inferred from the circumstances of the transaction and the actions of defendant. The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact. **State v. Alexander**, 2014-1619 (La.App. 1 Cir. 9/18/15), 182 So.3d 126, 130, writ denied, 2015-1912 (La. 1/25/16), 185 So.3d 748.

G.W. testified that she lived alone at the time of the incident. She further testified that she observed the perpetrator on the monitor screen, located in her bedroom, as he was at her front door looking into her home. She confirmed that prior to the incident, she had never seen the individual around her property. She immediately knew something was amiss and called 911. She stated that she was terrified while on the line with the 911 dispatcher. She testified that she believed the perpetrator was going to rape and kill

6

her if she had not been able to use her left shoulder to hold her bedroom door closed, as the perpetrator was kicking the door in an attempt to gain entry to her bedroom. G.W. confirmed that the lock on the sliding door at the back of her house did not work and had been broken for years, though she did have a lock on her side gate. G.W. denied knowing or talking to defendant and stated that he did not have permission to be in her home.

Unable to enter through the front door, the officers who responded to the scene went to the back of the house and entered through the rear, unlocked or ajar sliding door, and observed that things were in order and not in disarray. They walked down the hallway to the victim's bedroom door, which was the last door in the hallway. The officers passed several valuable items on the way to the victim's bedroom that were undisturbed. The victim's bedroom door had a visible shoe print and grass clippings on it. Captain Summerlin testified that he had been in law enforcement for almost twenty-four years and had worked or been on the scene of probably a thousand burglaries. He stated that based on his experience and considering the circumstances in this case, including the cut phone lines, the fact that the home was not ransacked, and the fact that no items were reported taken, he believed that the perpetrator was not there just to commit a theft. He specifically noted that the cut phone lines were an indication that the perpetrator knew the home was occupied and did not want the occupant to be able to make a phone call. He further responded positively when asked if he had ever been involved in the investigation of a burglary that turned into a violent crime, such as a burglar entering a home, surprising the resident, and using violence to restrain the resident.

Detective Marco Lopez with the STPSO was the lead detective in this case. Detective Lopez applied for, electronically obtained, and participated in the execution of the search warrant at defendant's residence. In addition to the knife, the officers photographed and collected a pair of black gloves, clothing (a white shirt and blue shorts), and shoes that were consistent with items worn by the perpetrator as evidenced by the surveillance footage. The shoes had grass clippings on them, despite the fact that defendant's yard was not grass, but consisted of gravel and dirt. The landscaping of the victim's yard consisted of short, recently cut grass. Defendant was in bed when the

7

officers entered, and the gloves and shoes were found in proximity to defendant's bed. The knife was recovered from the kitchen sink.

Detective Lopez and Detective Miceli conducted the post-arrest interview of defendant. Defendant admitted to having a history of heavy drinking, stating that he would sometimes "black out" and make "mistakes" during which he did not have control over, was not aware of, and was unable to recall his actions.

Defendant confirmed that he consumed four to five beers on the night of the offense. After repeatedly denying going to the victim's home, defendant ultimately admitted to going to the victim's residence as shown in the surveillance footage. He stated he did not recall why he was going there but was adamant that he did not go there to hurt the victim because he would never hurt anyone. He initially denied going there to take anything. When further questioned, defendant ultimately indicated that he "might have" been there to "take something or steal something" but said he could not say for certain because he was "under the influence" and "unaware" of his own actions. Defendant further admitted that he "made a mistake" and had a "moment of weakness" in going to the victim's home.

Defendant detailed how he gained entry into the residence. Specifically, he noted that after entering the gate, as he could not gain entry through the front door, he then went to the sliding door in the back, which was already open. He denied taking anything or seeing anyone while inside of the home. He stated that he left after hearing the victim say "police, police." Defendant denied being armed with a knife, initially stating that he thought he had a "piece of screwdriver" but then stating it was a "piece of stick" or a branch. He further denied cutting the phone lines, stating, "I don't remember that." Defendant said that he knew the victim prior to the incident, describing her as "a sweet lady" and "a friend." He stated that he would "talk to her every day." Defendant denied going to G.W.'s home for any sexual or companionship purposes. He also denied trying to force G.W.'s bedroom door open.

Special Agent Tim Reichenbach, a retired federal agent and former STPSO officer, testified regarding defendant's prior conviction. Specifically, on April 23, 1992, around 2:11 a.m., Officer Reichenbach was dispatched to the report of a rape at the Speedway

Service on Highway 11 in Slidell. The victim was present when he arrived and provided a description of the perpetrator. The victim was cleaning the restroom when the perpetrator came into the restroom and raped her. When she started screaming, he told her that he had a knife and that if she did not shut up, he would kill her. The victim said she did not see the knife but believed the perpetrator's claim to be armed. The victim's name tag, wedding ring, and watch were also taken. Defendant was apprehended about an hour later. He matched the victim's description of the perpetrator and had her items in his possession. Defendant pled guilty to the offense.[9]

In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. **State v. Mangrum**, 2020-0243 (La.App. 1 Cir. 2/22/21), 321 So.3d 986, 992, writ denied, 2021-00401 (La. 10/1/21), 324 So.3d 1050. Further, if believed, the testimony of the victim alone, with no other evidence, is sufficient to prove the elements of the offense. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. **Id.** An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).

**Aggravated Burglary**

With regard to aggravated burglary, the State was required to prove beyond a reasonable doubt the following four elements: (1) the unauthorized entering of any inhabited dwelling; (2) where a person is present; (3) with the intent to commit a felony or any theft therein; (4) if the offender is armed with a dangerous weapon. LSA-R.S. 14:60(A)(1). Herein, the State presented to the jury the victim's 911 call recording of the incident in progress, the victim's testimony, the surveillance footage, and defendant's recorded interview. The evidence shows that the victim was present when defendant

---

[9] Corporal Angelina Cook with the sex offender registry division of the STPSO testified that defendant is listed on the sex offender registry roster. She noted that to the best of her memory, defendant was released from prison on August 1, 2018.

9

entered her home without authorization while armed with a knife. As to defendant's intent to commit a felony or theft within the home, we note that the verdict sheet indicates that attempted first degree rape was used as the underlying offense to support the conviction of aggravated burglary. Thus, we now turn to the evidence in support of count two.

**Attempted First Degree Rape**[10]

Regarding defendant's intent to rape G.W., defendant consistently denied going to G.W.'s residence to harm her or take anything before ultimately agreeing that he may have been there to steal or take something and was startled by the victim's presence in the home and her call out to the police. However, defendant repeatedly contradicted himself during the interview, at first being adamant that he was not there, later agreeing he was there, but repeatedly claiming that he was unaware of his actions or intent, and constantly claiming that he had no intent to harm the victim or steal anything. Defendant stated he had no idea or recollection as to what his intentions were, yet somehow was able to say what he did not intend to do. Under the circumstances, we cannot say that the jury was irrational in rejecting defendant's hypothesis of innocence in this case.

In **State v. Prine**, 44,229 (La.App. 2 Cir. 5/20/09), 13 So.3d 758, 760-61, writ denied, 2009-1361 (La. 2/5/10), 27 So.3d 298, the defendant was convicted of computer-aided solicitation of a minor and attempted aggravated rape of a female whom he believed to be eleven years old, based on online communications with an undercover officer posing as a twenty-eight-year-old female with a fictitious eleven-year-old daughter. After the undercover officer sent the defendant a picture of an eleven-year-old girl, the defendant made online comments stating he wanted to have sex with the child. He arranged to meet with the mother of the child at a convenience store and said he would bring condoms for the child. The defendant was taken into custody at the convenience store and the police recovered condoms, as well as various other apparent

---

[10] As indicated, the State was required to prove beyond a reasonable doubt the following four elements of attempted first degree rape: (1) the specific intent to commit anal, oral, or vaginal sexual intercourse with a person; (2) without that person's lawful consent; (3) where the offender does an act for the purposes of and tending directly to accomplish one or more of those acts of intercourse; (4) and the victim is prevented from resisting the act because the offender is armed with a dangerous weapon. LSA-R.S. 14:27; LSA-R.S. 14:42(A)(3).

accouterments (rope, tape, a gun, etc.), from his car. As the defendant was being advised of his rights, he, in part, said something like, "I knew better." **Prine**, 13 So.3d at 762. Although there was absolutely no physical contact in that case, the **Prine** court held that a reasonable finder of fact could have concluded that the defendant's actions constituted an act for the purpose of and tending directly toward commission of aggravated rape. **Prine**, 13 So.3d at 765-66.

Similar to the **Prine** case, defendant's contact with the victim herein was limited, as her quick diversion resulted in him halting his attempt to forcefully enter her bedroom and escaping from the home to avoid what he thought was an imminent encounter with the police. Considered as a whole, defendant's actions of arming himself with a knife, cutting the victim's home phone line, proceeding to the victim's bedroom where she alone was present, attempting to kick open the bedroom door with the victim inches away using her shoulder to prevent his entry, passing valuable items along the way, and then leaving the victim's home without taking anything of value, are overt acts from which a trier of fact could reasonably infer the specific intent to commit a sexual act without the victim's consent. Further, the jury heard LSA-C.E. art. 412.2[11] evidence that, in 1992, defendant committed a rape while claiming to be, as he was in this case, armed with a knife. He subsequently pled guilty to that offense. The jury was free to weigh such evidence in its role as a factfinder.[12] See **State v. Elzy**, 2009-2263 (La.App. 1 Cir. 5/7/10), 2010 WL 1838321, *9-10 (unpublished), <u>writ denied</u>, 2010-1281 (La. 2/18/11), 57 So.3d 328 (finding a defendant's involvement in facilitating a prior rape physically committed by another perpetrator was probative to contradict his notion that he had no involvement in

---

[11] Louisiana Code of Evidence article 412.2, titled "**Evidence of similar, crimes, wrongs, or acts in sex offense cases**" pertinently reads:

> A. When an accused is charged with a crime involving sexually assaultive behavior …, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior…may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.

[12] Prior to defendant's trial herein, the trial court held a hearing on the admissibility of the LSA-C.E. art. 412.2 evidence of defendant's 1993 conviction of forcible rape and ruled that it was admissible to establish defendant's intent when he entered the victim's home. On appeal, defendant did not assign error to the admission of the LSA-C.E. art. 412.2 evidence. Article 412.2 merely requires that the defendant has committed another act involving sexually assaultive behavior. **Elzy**, 2010 WL 1838321 at *9.

another rape committed by the same perpetrator); see also **State v. Wallace**, 41,720 (La.App. 2 Cir. 1/24/07), 949 So.2d 556, 559-60 (finding a defendant's similar prior sexual conduct with a victim of similar age was highly probative of the requisite intent for the crime). Finally, the jury heard defendant's own statements in which he repeatedly contradicted himself and attempted to limit his culpability, but ultimately conceded that he, as he admittedly had done in the past, made a mistake and had a moment of weakness on the night in question. Lying or purposeful misrepresentations reasonably raise the inference of a "guilty mind" and has been recognized as indicative of an awareness of wrongdoing. **Dyson**, 222 So.3d at 234.

In this case, the jury apparently found that the evidence, in its entirety, sufficiently showed beyond a reasonable doubt that defendant intended to commit an act of sexual intercourse when he entered the victim's home. The determination of whether specific intent exists is a fact question for the jury. **Ordodi**, 946 So.2d at 661. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a factfinder's determination of guilt. **State v. Lavy**, 2013-1025 (La.App. 1 Cir. 3/11/14), 142 So.3d 1000, 1006, writ denied, 2014-0644 (La. 10/31/14), 152 So.3d 150.

When viewed in the light most favorable to the State, as required on appellate review, a rational trier of fact could have found that the State proved all elements of aggravated burglary and attempted first degree rape beyond a reasonable doubt. See **Livous**, 259 So.3d at 1043-44. Accordingly, we find no merit in pro se assignment of error number one.

### PRO SE ASSIGNMENT OF ERROR NUMBER TWO

In pro se assignment of error number two, defendant argues that the two convictions in this case constitute a violation of his constitutional protection against double jeopardy. He claims the two offenses were based on a single set of facts and that no unique action separates the two crimes. He argues that aggravated burglary does not necessarily require proof of an additional fact beyond the facts required to support a conviction of attempted aggravated rape. He notes that the special verdict form shows that the jury found attempted first degree rape as the underlying crime in the aggravated

12

burglary conviction. He argues the trial court erred in denying his pretrial motion to quash on the grounds of double jeopardy.

The federal and state constitutions both provide that no person shall twice be put in jeopardy of life or liberty for the same offense. U.S. Const. amend. V; LSA-Const. art. I, § 15. Double jeopardy provisions protect an accused not only from a second prosecution for the same offense, but also multiple punishments for the same criminal act. See U.S. Const. amend. V; LSA-Const. art. 1, § 15; LSA-C.Cr.P. art. 591. See also **Blockburger v. United States**, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); **State v. Frank**, 2016-1160 (La. 10/18/17), 234 So.3d 27, 33-34 (finding protections against double jeopardy fall within the analytical framework set forth in **Blockburger** and Louisiana courts need apply only that framework in analyzing questions of double jeopardy); **State v. Burgess**, 2019-1603 (La.App. 1 Cir. 9/22/20), 315 So.3d 279, 285-86, writ denied, 2020-01189 (La. 2/17/21), 310 So.3d 1148. Under the **Blockburger** test, the applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not. **Blockburger**, 284 U.S. at 304, 52 S.Ct. at 182.

Thus, the **Blockburger** test focuses on the statutory elements of the offenses, not on their application to the facts of the specific case before the court or on the actual evidence presented at trial. Therefore, the question under **Blockburger** is not whether this violation of a certain criminal statute also constituted a violation of a second criminal statute, but whether all violations of the former constitute violations of the latter. **Burgess**, 315 So.3d at 285.

As detailed in addressing pro se assignment of error number one, the crimes of aggravated burglary and attempted first degree rape, according to their statutory definitions, are clearly not the same offense, as they do not contain identical elements. The crime of aggravated burglary requires the element of the unauthorized entry of an inhabited dwelling; attempted first degree rape does not. The offense of attempted first degree rape requires the element of the specific intent to commit anal, oral, or vaginal

13

sexual intercourse with a person; aggravated burglary does not. See LSA-R.S. 14:60(A)(1); LSA-R.S. 14:27; LSA-R.S. 14:42(A)(3).

Based on the foregoing, it is clear that the crimes of aggravated burglary and attempted first degree rape are two separate and distinct offenses, requiring separate and distinct evidence for conviction. Each offense required proof of an additional fact not required by the other offense. Specifically, the conviction of aggravated burglary required proof of an unauthorized entry, and the conviction of attempted first degree rape required proof of an attempt at sexual intercourse. Therefore, applying the **Blockburger** test, we do not find that defendant's prosecution, convictions, and sentencing for both crimes violated double jeopardy. We find no error in the trial court's denial of defendant's motion to quash. Thus, we find no merit in pro se assignment of error number two.

### COUNSELED ASSIGNMENT OF ERROR NUMBER ONE

In counseled assignment of error number one, defendant argues that the trial court erred in denying a challenge for cause of a prospective juror on panel one, Charles Williams. Defendant asserts that Mr. Williams' responses revealed his prejudice regarding a defendant's right not to testify. Defendant contends that Mr. Williams firmly believed that an innocent person would want to defend himself by testifying and that Mr. Williams could not ignore this belief, even if instructed to do so. Defendant argues that Mr. Williams' responses as a whole indicate that he could not be a fair and impartial juror.

Louisiana Code of Criminal Procedure article 797 provides, in pertinent part, that the State or the defendant may challenge a juror for cause on the ground that the juror is not impartial, whatever the cause of his partiality. LSA-C.Cr.P. art. 797(2). To prove there has been error warranting reversal of the conviction, the defendant need only show (1) the erroneous denial of a challenge for cause, and (2) the use of all his peremptory challenges. **State v. Lane**, 2015-0064 (La.App. 1 Cir. 11/9/15), 2015 WL 6951423, *13 (unpublished), writ denied, 2015-2248 (La. 3/24/16), 190 So.3d 1190. In **State v. Magee**, 2011-0574 (La. 9/28/12), 103 So.3d 285, 307, cert. denied, 571 U.S. 830, 134 S.Ct. 56, 187 L.Ed.2d 49 (2013), the Louisiana Supreme Court recognized that even where a defendant ultimately exhausts his peremptory challenges, he must use one of his remaining peremptory challenges curatively to remove the objectionable juror or

14

waive the complaint on appeal. This requirement, through which a defendant is forced to use a remaining peremptory challenge in order to preserve error in the denial of a challenge for cause, is sometimes referred to as the "strike or waive" rule. **Id.**

In the instant case, defendant ultimately exhausted his peremptory challenges, but he declined to use an available peremptory challenge curatively against Mr. Williams. Thus, applying the "strike or waive" rule, defendant waived the error raised in counseled assignment of error number one. **State v. Halford**, 2020-0585 (La.App. 1 Cir. 6/4/21), 327 So.3d 1004, 1016, writ denied, 2021-00866 (La. 11/3/21), 326 So.3d 884, cert. denied, 142 S.Ct. 2658, 212 L.Ed.2d 612 (2022).

## COUNSELED ASSIGNMENT OF ERROR NUMBER TWO

In counseled assignment of error number two, defendant argues that he invoked his right to remain silent and privilege against self-incrimination during his police statement, when he stated, "Y'all gonna book me or what? I ain't got no more to say." Defendant contends that the trial court erred in failing to suppress any subsequent statements. In support of his argument, defendant cites **State v. Hebert**, 2020-00671 (La. 5/13/21), 320 So.3d 406 (per curiam) (wherein the defendant stated, "Sir, I ain't got nothing to talk to y'all about.").

It is well settled that before a confession or inculpatory statement can be introduced into evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. See LSA-R.S. 15:451. Confessions or inculpatory statements obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, are involuntary and inadmissible as a matter of constitutional law. The record must also establish that an accused who makes a confession or inculpatory statement during custodial interrogation was first advised of his **Miranda** rights. See **State v. Adams**, 2015-1155 (La.App. 1 Cir. 12/23/15), 2015 WL 9438859, *8 (unpublished), writ denied, 2016-0172 (La. 2/17/17), 216 So.3d 50.

Since the general admissibility of a confession or inculpatory statement is a question for the trial court, its conclusions on the credibility and weight of the testimony are accorded great weight and will not be overturned unless they are not supported by

15

the evidence. See **State v. Braggs**, 2022-1008 (La.App. 1 Cir. 3/6/23), ___ So.3d ___, ___, 2023 WL 2362487, *2. However, a trial court's legal findings are subject to a *de novo* standard of review. The trial court must consider the totality of the circumstances in determining whether a confession or inculpatory statement is admissible. **Id**. In determining whether the ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence introduced at the trial of the case. **State v. Baker**, 2020-1253 (La.App. 1 Cir. 11/1/21), 332 So.3d 692, 695.

Although the burden of proof is generally on a defendant to prove the grounds recited in a motion to suppress evidence, such is not the case with the motion to suppress a confession or statement. In such a situation, the State has the burden of proving the admissibility of the confession or statement. LSA-C.Cr.P. art. 703(D). The State must prove beyond a reasonable doubt that the confession was made freely and voluntarily. Therefore, if the defendant alleges police misconduct in eliciting a confession, it is incumbent upon the State to rebut these allegations specifically. **State v. Hills**, 2022-0549 (La.App. 1 Cir. 11/4/22), 2022 WL 16707743, *4 (unpublished). The direct testimony of the interviewing police officer can be sufficient to prove a defendant's statement was freely and voluntarily given. **State v. Flowers**, 2016-0130 (La.App. 1 Cir. 9/19/16), 204 So.3d 271, 279, writ denied, 2016-1871 (La. 9/6/17), 224 So.3d 983.

The Supreme Court in **Miranda** stated that if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. When a defendant exercises his privilege against self-incrimination, the validity of any subsequent waiver depends upon whether the police have scrupulously honored his right to remain silent. **State v. Taylor**, 2001-1638 (La. 1/14/03), 838 So.2d 729, 739, cert. denied, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004). However, the exercise of the right to remain silent does not act as a complete bar to further questioning. Whether the police have "scrupulously honored" a defendant's "right to cut off questioning" is a determination made on a case-by-case basis under the totality of the circumstances. **State v. Leger**, 2005-0011 (La. 7/10/06), 936 So.2d 108, 125, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007); **Taylor**, 838

16

So.2d at 739. Factors considered in the assessment include: who initiates further questioning; whether there has been a substantial time delay between the original request and subsequent interrogation; whether **Miranda** warnings are given before subsequent questioning; whether signed **Miranda** waivers are obtained; and whether pressures were asserted on the accused by the police between the time he invoked his right and the subsequent interrogation. **Adams**, 2015 WL 9438859 at *9.

In **Davis v. United States**, 512 U.S. 452, 459-61, 114 S.Ct. 2350, 2355-56, 129 L.Ed.2d 362 (1994), the Supreme Court held that a suspect who desires the assistance of counsel during interrogation must unambiguously request counsel. In **Berghuis v. Thompkins**, 560 U.S. 370, 381-82, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010), the Supreme Court found that the rule for invoking the right to remain silent was the same as the **Davis** rule for invoking the right to counsel; that is, the accused who wants to invoke his right to remain silent must do so unambiguously.

Herein, Detective Lopez testified at the motion to suppress hearing. Detective Lopez arrested, booked, and conducted a recorded interview of defendant in this case. As Detective Lopez testified, at the beginning of the interview, defendant was advised of his **Miranda**[13] rights and signed a waiver of rights form. Defendant did not seem impaired or intoxicated at the time of the interview, though he admitted that he consumed beer earlier the night before.

During the interview, defendant repeatedly denied being involved in the incident or being at G.W.'s home. Around twenty minutes into the interview, defendant said, "Y'all gonna book me or what? . . . I ain't got no more to say." Around thirty minutes into the interview, defendant asked what he was being charged with and repeated the question approximately two minutes later. Despite these statements, defendant continued to answer questions and never stated that he wanted the interview to end. Rather, defendant continued to speak to the officers for an additional hour of interrogation. When asked if a response such as "I don't have more to say" would make

---

[13] Defendant was informed of his right to remain silent, that any statement he did make could be used as evidence against him, and that he had a right to the presence of an attorney, either retained or appointed. He signed a waiver of rights form stating these rights and further stating that he understood his rights, including the right to decide at any time to exercise his rights and not answer any questions or make any statements.

17

him cease the interview, Detective Lopez stated, "No. It's common for defendants not to want to be forthcoming. It's the purpose of having a conversation and interview."

As noted, defendant relies on **Hebert** on appeal. The defendant therein repeatedly stated that she did not want to talk to the police and that she wanted to leave. She told officers at least eleven times that she did not want to talk to anyone; and she repeated that several more times while she was left alone in the room. Further, she was told seven separate times that if she gave a statement she could leave. The Louisiana Supreme Court found the State failed to carry its burden of proving the voluntariness of the defendant's statements, which were induced by the promise of release. **Hebert**, 320 So.3d at 409-11.

Similarly, in **Leger**, the Louisiana Supreme Court found that the defendant invoked his right to remain silent when he told the police he did not want to talk anymore. **Leger**, 936 So.2d at 125-26. During the interview, Leger was unresponsive and initially refused to talk at all. Throughout the questioning, Leger repeatedly stated that he did not want to talk and particularly said multiple times that he "did not want to talk about it" and "did not want to talk anymore." Further, no waiver of rights form was generated during the interview. **Id.**

We find that the exchange in this case is distinguishable from those in **Hebert** and **Leger**. In this case, defendant was never made any promises or given any indication that he could leave if he made a statement. Furthermore, there was no unambiguous invocation by defendant of his right to terminate all questioning, where defendant stated one time, in passing, during the course of a one hour and fifty-one-minute interview[14] that he had no more to say and where defendant never ceased speaking to the officers, but instead continued answering their questions. Thus, we agree with the trial court's assessment that **Hebert** is distinguishable from the instant case.

---

[14] The recording begins at 6:25 a.m. The interview itself started when the officers entered the room at 6:28 a.m. and ended at 8:17 a.m., after which defendant remained in the room alone until 8:51 a.m., at which point the recording ends. Prior to the cessation of the interview at 8:17 a.m., there was a thirty-minute interval between 7:40 a.m. and 8:11 a.m., during which defendant sat in the room alone before being briefly taken out of the room. The one hour and fifty-one-minute approximation above includes the approximate three minutes defendant waited for the interview to begin and the thirty-minute interval.

We find that the circumstances of this case are, instead, analogous to those presented in **State v. Watson**, 2014-0350 (La.App. 1 Cir. 9/19/14), 2014 WL 4668773 (unpublished), writ denied, 2014-2211 (La. 6/19/15), 172 So.3d 649. Therein, shortly before the defendant confessed, he told the officers conducting the interview that he "[didn't] want to talk about it no more." **Watson**, 2014 WL 4668773 at *2. In finding that there was no unambiguous invocation by the defendant of his right to terminate all questioning in that case, this court noted that during the almost two hours of questioning, this was the only instance (about eighty-four minutes into the interview) where the defendant said he did not want to talk. **Watson**, 2014 WL 4668773 at *9-10.

Likewise, in **State v. Prosper**, 2008-839 (La. 5/14/08), 982 So.2d 764, 765, very similar to this case, the defendant stated, "I don't have nothing else to say," during a police interview. The Louisiana Supreme Court found that, given the totality of the circumstances, the defendant's comment, did not reasonably suggest a desire to end all questioning or remain silent, where the defendant continued making other statements. See also **State v. Hebert**, 2008-0003 (La.App. 1 Cir. 5/2/08), 991 So.2d 40, 46, writs denied, 2008-1526, 2008-1687 (La. 4/13/09), 5 So.3d 157, 161.

In the instant case, defendant was informed of his rights, he indicated he understood those rights, and he intelligently waived them. The trial court found, and our review of the interview supports these findings, that defendant was not coerced, threatened, or intimidated in any way. Moreover, defendant never demonstrated an unequivocal invocation of his right to remain silent. Despite defendant saying once, during the course of the lengthy interview, that he did not have anything more to say, he never stopped talking or responding to questions, and he never asked for the interview to cease. We find that defendant's indication that he had nothing further to say did not reasonably suggest a desire to end all questioning or to remain silent. Considering defendant's overall demeanor and his responses to questioning as a whole, we find that the officers were reasonable in not terminating the interview. Thus, we find no error or abuse of discretion in the trial court's denial of the motion to suppress the statements. Counseled assignment of error number two is without merit.

## CONCLUSION

Considering the above, we affirm defendant's convictions and sentences.

**CONVICTIONS AND SENTENCES AFFIRMED.**